Filed 6/26/13  In re K.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E057473 |
| Plaintiff and Respondent, | (Super.Ct.No. J237918) |
| v. | OPINION |
| A.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Jeffrey L. Bryson, Deputy County Counsel, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

Defendant and appellant, A.M. (Mother), is the adoptive mother and paternal grandmother of K.M. (hereafter K.4), born July 2001.  Mother appeals from the juvenile court's order terminating her family reunification services and establishing a planned permanent living arrangement as K.4's long-term plan.  Mother contends (1) the juvenile court erred in finding that returning K.4 to her care would pose a substantial risk of detriment, and (2) the attorney who jointly represented K.4 and his three older siblings, K.1, K.2, and K.3, born in 1996, 1997, and 1998, respectively, had a conflict of interest because K.4 wanted to return to Mother and denied she had abused him while his siblings did not want K.4 to return to her custody and insisted Mother had abused both them and K.4.  We find no error, and we affirm.

## II.  FACTS AND PROCEDURAL BACKGROUND

On March 14, 2011, plaintiff and respondent, San Bernardino County Children and Family Services (CFS), filed petitions as to all four children[1] under Welfare and Institutions Code[2] section 300, subdivisions (a) (serious physical harm) and (b) (failure to protect).  The petitions alleged Mother had a history of physically abusing the children, having other adults in the home physically abuse them, and using excessive discipline.

---

[1] This appeal concerns only K.4, but information about his siblings is included as relevant.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The detention report stated that in March 2011, sheriff's deputies went to K.1's high school after she reported physical abuse by Mother and two aunts, C. and N., who lived in the household. K.1 told a social worker that she had marks and bruises on her buttocks from being hit with a belt, and she had also been hit by a shoe and hand. She feared further abuse for herself and her siblings. K.1 also reported that the children were disciplined by having to hop on one foot for minutes to hours at a time. K.1 stated that K.4 "g[ot] in trouble the most and he g[ot] the most marks and bruises."

K.2 told the social worker the children had to jump on one leg "for 'a whole day'" when they got in trouble, and when they got "'whooped,' they [we]re made to pull their pants and underwear down and ha[d] to lean over the toilet, couch, or stand against the bathroom wall and get hit." K.2 was scared of Mother and her aunts.

K.3 said that for punishment, the children had to jump for "up to 'thirty-five minutes.'" He had been spanked on the "'butt'" with a belt, and one time had gotten a scratch, but "nothing 'serious'" happened to K.4. K.3 said he felt safe in the house.

K.4 told the social worker he had been "whooped" with a belt and a stick, although it was "'not that bad,'" and he had been made to hop on one foot for an hour or a whole day. He had to pull his pants down when he got "'whooped.'" He said his Aunt N. usually did the spanking because Mother had diabetes, and he was afraid of N. He denied having any current marks or bruises.

3

The social worker interviewed Mother, C., and N., and they all denied ever hitting, spanking, or physically abusing the children, but they admitted they made the children write standards and jump on one foot for five to 15 minutes as a form of discipline. Mother said K.1 had made up lies because she wanted to go live with her biological mother, against whom Mother and the aunts had a restraining order. The aunts reported they did not live in the house with Mother, but lived at different addresses. However, when the social worker went to those addresses, she was informed that the aunts did in fact live with Mother.

When a social worker went to K.1's school on March 7, the staff reported she had been taken out of school and might be home schooled. At Mother's home, Mother at first refused to let the social worker speak to K.1. When Mother relented, K.1 told the social worker that Mother had taken her to the police station, the high school, and child protective services to apologize and to say she had lied. K.1 said she had apologized to a police officer for lying; the police officer then took her aside, and she told him everything she had reported earlier about the abuse was true.

The detention report stated that Mother had prior open dependency petitions as to K.3 and K.4. At the detention hearing, the juvenile court detained the children in foster care.

CFS filed a jurisdictional/dispositional report in April 2011. K.1 and K.2 had been placed together in one foster home, and K.3 and K.4 were placed together in another home. The children had supervised hourly visits with Mother every week. K.1 and K.2

4

told the social worker they did not want to return home and feared they would have to. They did not want to visit or be placed with any family members. They confirmed that the information they had previously reported was true. K.3 and K.4 also confirmed to the social worker that the information in the police report was true. K.4 had told a deputy he had been "whooped" about 10 times in the past year, mostly with a leather belt, and N. had once hit him with a belt about 30 times. The "whooping" left bruises or red marks on his bottom, and his bottom hurt for one or two days afterward. K.3 was willing to visit Mother but did not want to live with her. K.4 did want to go back home. He had not adjusted well to his placement and was "throwing fits, hitting other children and walls." The foster mother had requested a placement change because she could not deal with K.4's behavior.

A mediation report stated that as of early May 2011, all four children refused visits with Mother.

CFS filed an addendum report in July 2011. K.4 had started counseling on June 26, and after that, he went to weekly supervised visits with Mother. Mother continued to deny that abuse had occurred and told the social worker she believed the children had "made up these lies."

All four children were evaluated by the Children's Assessment Center. The interviews and physical findings were consistent with child abuse. The children reported being beaten with hands, belts, switches, the metal part of a fly swatter, a broken hula hoop, and other items; denial of bathroom access; being forced to wear a diaper to school

5

after a bathroom accident; withholding of food and overfeeding; belittling statements; being forced to jump on one leg for extended periods; and having to write standards. K.3's medical examination revealed "numerous scars, some from a belt." K.2's medical examination also revealed numerous scars, some of which she attributed to abuse. K.2 reported that K.4 had received the most beatings and had been in the most trouble.

K.4's medical examination was "very concerning" because he was guarded and provided answers before being questioned. He spontaneously told the examiner: "We got spankings from a lot of people. We got bruises, but that's been covered already. But the bruises were maybe just from myself. I really doubt anybody really did it to me. I probably did them to myself." He had several scars on his body. He also had blood behind the left tympanic membrane that may have been caused by trauma: a CT scan indicated it was an old injury. K.4 had had several placement changes because of behavioral problems, but he was prescribed psychotropic medication and appeared to be "maintaining" better. K.4 told the interviewer both that he did not want to live with Mother and that she had not done anything bad to him, and it would be safe for everyone to return to her home.

The contested jurisdictional/dispositional hearing took place in August 2011. Mother testified she did not hit the children with a belt buckle or hula hoop, and she never punished them by denying food or forcing them to eat food. She had spanked them only with a hand on their bare buttocks, but she had not done so for years, and she had not caused any of the scars on K.3's and K.4's bodies. She testified she had made the

6

children jump to calm them down, and she did not "whoop" them when they stopped jumping. The principal at the children's school testified that K.1 and K.2 lied and the children had stolen "[m]any times." None of the children had reported that Mother was abusing them. The juvenile court found true the allegations of the section 300 petition and ordered reunification services for Mother.

CFS filed a six-month status review report in February 2012. Mother entered and completed a counseling program, a 12-week training course on foster and kinship care education, and two hours' training on anger and anger management. Mother denied ever physically abusing the children or that any other adults had done so.

K.1 and K.2 refused to visit Mother and did not want to return to her home; K.3 had not been visiting Mother but stated he "may seek to visit with [M]other at some point." He also stated he did not want to return to her home. K.4 appeared to miss being with Mother, and they visited weekly. The visits were increased to overnight weekend visits in November 2011. K.4 began acting out in school and in his foster home, so the visits returned to weekly monitored visits. K.4 was not afraid of Mother. The other children reported that K.4 had gotten into trouble the most when at home.

K.4 had been diagnosed with attention deficit/hyperactivity disorder and oppositional defiant disorder, for which he took prescribed psychotropic medication. He struggled in school because of his behaviors, but he was on target developmentally. The children were all placed in separate foster homes, and all appeared to have adjusted.

At the six-month review hearing, the juvenile court found that Mother had failed to participate regularly or make substantive progress in the reunification plan, although she had made substantial progress. The court continued reunification services for Mother.

CFS filed a status review report in May 2012. K.1, K.2, and K.3 all continued to state they did not want to return to Mother's home and refused visits with her. K.4 continued to state he did want to return home and denied he had been abused in the home. Mother reported that the children's Aunt N. continued to reside in the home. Mother continued to deny the children had been abused in the home by her or by their aunts. Mother had supervised weekly visits with K.4, and the children visited each other two to four times per month. K.4 continued to have mental and emotional problems and was taking prescription psychotropic medication. He had adjusted to his foster placement but wanted to return to Mother's home.

At the status review hearing, K.4 addressed the court as follows: "There's something I wanted to say about my grandma. When I was living with my grandma I found out a lot about my family, and for one thing, my grandma did not hurt me or hit me or touch me or abuse me by any chance because my grandma—she didn't have the strength enough to because she had diabetes, and she used to get shots in her arm because she needed to—it was like her medication, and so she got it in her arm, and sometimes her arm gets really weak. She didn't have the strength to hit me or hurt me, so I never got hit by her. That is one thing I know, and my Auntie [V.] was hardly at the house.

8

Sometimes she would be over there with my—my Auntie [M.] or any other family members. [¶] . . . [¶] And I don't really want to be in the foster home anymore. I feel it is safer with my family, and I feel that I'm protected with my family, and they teach me more than . . . I could be teached [*sic*] anywhere else besides that house. And my [M]other never did anything wrong, and I need to get back to her either today or somewhere in time." K.4 added: "One more thing. My sister even admitted to the whole family she had lied the first time that this was happening." The juvenile court continued reunification services as to K.4 only. The court found that Mother had made moderate progress on her case plan and ordered continued weekly supervised visits with K.4.

CFS filed a status report in September 2012. The social worker noted that family reunification services had been terminated after the prior hearing as to K.1, K.2, and K.3. The social worker spoke to the oldest three children about K.4's return to Mother, and "[a]ll three (3) children ardently continue[d] to attest to the physical abuse that they and [K.4] suffered at the hands of their [M]other . . . and their aunt [N.] who live[d] in the home." The social worker reported that since visits between Mother and K.4 had been liberalized in July 2012, "the child has increasingly acted out to include excessive lying, using profanity, destroying property, and smearing food all around at the dinner table." Yet another foster family had requested his removal.

At the permanency review hearing, Mother testified she had completed classes in anger management and family dynamics, and she had learned what forms of discipline were appropriate and inappropriate. She had also gone to counseling. She believed that

9

she had learned techniques that would help her avoid physical or mental abuse. She testified that before the dependency began, she had disciplined the children by talking to them, sending them to their rooms, restricting them from events and outings, or doing standards. She had spanked the children by putting them on her knees, pulling down their pants, and spanking them with her hand. She did not spank K.4 with anything but her hand. She had the children jump when they were "harrowsed" for five to 10 minutes until they were ready to talk to her. She was asked if she understood why the children had been removed, and she replied: "Because of the 'B' that his sister said, that she was going to get a beating because she got a 'B.' All the kids was [*sic*] removed because of that." When asked what she had learned in her classes and in counseling about what she had been doing wrong that had led to the children's removal, she responded: "The only thing that I can say I did wrong, I didn't put them into other activities. Because of you saying the abuse, I did not do a hula-hoop; I did not do the starving them with or not— punishment with oatmeal, the belt buckle, I didn't do that. . . . If I did something wrong, it was not putting them into doing another alternative like putting them in sports or something like that." She stated a professor in a class she had taken before the dependency had suggested jumping as a technique to deal with children with attention deficit disorder or attention deficit/hyperactivity disorder. The children jumped on two legs, not one leg, and they could end it at any time by coming to discuss the issue at hand. The longest any of the children had ever jumped was 10 or 15 minutes.

Counsel for the children told the court that K.4 would not testify, but counsel "talked to him and his feelings are and he would—he gave me instructions on specific things that he wished the Court to know. One, and above everything, is that he wants to go home. He's always wanted to go home and that he feels safe at home and he's always felt safe at home. He thinks that his problems and his behavior that he's been having recently and in placement is because he's not with his family and his grandmother at home and that he feels that he deserves to be with his family rather than where he's at. And that's his strongest desire is that he would like to go home." Counsel represented to the court that K.4 had "never indicated to anybody that he was ever abused," although he had been spanked.

The juvenile court found that K.4 was not adoptable, and no adult was available to become his legal guardian. The court further found that termination of parental rights was not in his best interest, and the proposed permanent plan was placement in a group home with the goal of a less restrictive foster home within six months. The court terminated reunification services for Mother but allowed continuing visitation with K.4 for one hour per week with the possibility of future liberalized visitation.

## III.  DISCUSSION

### A.  Sufficiency of Evidence

Mother contends the juvenile court erred in finding that returning K.4 to her care would pose a substantial risk of detriment. CFS does not dispute that Mother completed the formal requirements of her case plan. CFS does dispute, however, whether Mother

11

benefited from her services. The juvenile court and CFS believed K.4 should not be returned to Mother's custody because she continued to deny abusing the children.

Mother argues that "it is an outrageous injustice to use the fact parents deny they have committed a horrible act as proof that they did it. That really is Kafkaesque." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1752-1753, fn. omitted.) The court in that case stated it was unjust to use a parent's denial as "the very fact which demonstrates" that a parent failed to protect the child. (*Id.* at p. 1753.) The court held that a psychologist's opinion that the mother had failed to internalize parenting skills was not substantial, credible evidence of detriment. (*Id.* at p. 1751.)

In *Blanca P.*, the court reversed the juvenile court's finding of detriment at an 18-month review hearing when "substantial new evidence," in the form of a psychologist's strong opinions, had developed that cast doubt on the accuracy of the jurisdictional finding that the father had sexually molested the child. (*Blanca P. v. Superior Court, supra,* 45 Cal.App.4th at pp. 1754, 1757.) While we agree that it could be unjust to require a parent to admit to wrongdoing as a condition of custody being returned, when the evidence strongly indicated that the wrongdoing had never occurred, this is emphatically not such a case. Here, Mother continued to deny the abuse despite strong evidence, both in all four children's reports to social workers, the police, and Children's Assessment Center interviewers and in the physical evidence of scars on their bodies, that the children had in fact been abused.

12

The juvenile court stated it had listened to Mother's testimony and had evaluated her credibility, and the court found that Mother failed to acknowledge there was even a problem. Although Mother testified she had benefited from her reunification services, she had learned the difference between appropriate and inappropriate discipline, and that if K.4 were returned to her she would not use inappropriate discipline, her continuing denial of abuse in the face of the strong evidence the abuse had occurred was a sufficient basis for the court to disbelieve her.

Other cases on which Mother relies are also distinguishable. In *In re Jasmine G.* (2000) 82 Cal.App.4th 282, dependency proceedings began after the mother used a switch and the father used a leather belt to discipline their child. (*Id.* at p. 285.) At the dispositional hearing, both parents testified they had "changed their attitudes toward corporal punishment . . . and expressed remorse that their physical abuse of their daughter had led to the dependency." (*Id.* at p. 286.) The court held that a social worker's subjective belief that the parents had not internalized parenting skills and their attitude towards the dependency proceedings were an insufficient basis for removal under section 361, subdivision (c). (*In re Jasmine G.*, *supra*, at pp. 288-289.) Here, in contrast, Mother has never acknowledged that her physical abuse led to the dependency; instead, she continued to maintain that the children were lying. Thus, the juvenile court's decision was not based on improper deference to a social worker's opinions, but on the juvenile court's own assessment of Mother's credibility.

13

In *In re C.C.* (2009) 172 Cal.App.4th 1481, 1490, the appellate court reversed an order suspending visitation based on a finding of detriment because the appellate court concluded the juvenile court had applied an incorrect standard. The court stated that "the notion of detriment is at best a nebulous standard that depends on the context of the inquiry." (*Ibid.*) In the present case, "the context of the inquiry" supports the juvenile court's credibility-based determination. Otherwise, the procedural posture of *In re C.C.* makes the case unhelpful to resolving the issues currently before us.

In *In re Kimberly F.* (1997) 56 Cal.App.4th 519, the court reversed the denial of a mother's section 388 petition. The mother had lost custody because her home was unsanitary. After reunification services were terminated at the 18-month review hearing, she filed a modification request based on the fact, among other things, that her home was then clean and safe and a psychologist reported she did not exhibit any psychopathology and was a concerned parent. (*In re Kimberly F.*, *supra*, at pp. 522, 525.) The appellate court held that another psychologist's earlier characterization of the mother as narcissistic and self-centered was insufficient: "Those are, at the absolute worst, literary descriptions of eccentricity, not tendencies to harm children. They cannot carry any weight in showing detriment." (*Id.* at p. 527.) The current case, in contrast, does not involve competing psychological assessments of a parent, but involves the juvenile court's assessment of the credibility of Mother's denial of abuse.

We conclude the juvenile court did not err in finding it would be detrimental to return K.4 to Mother's custody.

14

**B. Joint Representation**

Mother contends the attorney who jointly represented K.4 and his three older siblings had a conflict of interest because K.4 wanted to return to Mother and denied she had abused him, while his siblings did not want to return and insisted Mother had abused both them and K.4.

In *In re Celine R.* (2003) 31 Cal.4th 45, the court held that the juvenile court "may appoint a single attorney to represent all of the siblings unless, at the time of appointment, an actual conflict of interest exists among them or it appears from circumstances specific to the case that it is reasonably likely an actual conflict will arise. After the initial appointment, the court must relieve counsel from the joint representation when, but only when, an actual conflict of interest arises." (*Id.* at p. 50.)

As recounted above, K.4 wished to return home throughout the dependency, while his three older siblings adamantly opposed their own return and K.4's return and even refused visitation with Mother. K.1 wrote a letter to the court begging that K.4 not go back to Mother. Mother argues their joint counsel sided with the older siblings instead of independently advocating K.4's position.

Mother's argument presumes that appointed counsel for a child in a dependency proceeding has an obligation to advocate for the child's *wishes*, and when dependent siblings' wishes differ, a conflict of interest arises. Not so. Counsel's obligation is to represent the child's *interests*. (§ 317, subd. (e)(1).) In addition, "If the child is four years of age or older, counsel shall interview the child to determine the child's wishes

15

and assess the child's well-being, and shall advise the court of the child's wishes. *Counsel shall not advocate for the return of the child if, to the best of his or her knowledge, return of the child conflicts with the protection and safety of the child.*" (§ 317, subd. (e)(2), italics added.)

Counsel for the children took a position before the court that was aligned with the stated wishes of the older children not to be returned to Mother; however, he also complied with his obligation to inform the court of K.4's wish to return to Mother. At the same time, he communicated to the court that in his considered judgment, not returning K.4 would be in the child's best interests. He argued to the court that a conflict would arise if Mother's counsel insisted on calling the older children to testify because it would tear the children apart: "What I am saying is the last semblance of family that he has in reality is his siblings. Because at this rate he's never going back to his adoptive [M]other because she refuses to acknowledge the damage that she has done to this family, and as long as she has never accepted responsibility, . . . this Court is never going to return the child to that [M]other's care. And to go through a charade and the callousness towards this sibling set without an offer of proof that there's any relevance to any of the evidence they are going to present . . . shows a callousness that's out of place in this type of a court." As it transpired, Mother's counsel did not call the older children to testify, and a conflict therefore did not arise. At the final hearing, minor's counsel "just . . . submit[ted] it on the evidence and the social worker's report," which recommended that K.4 not be returned to Mother.

16

Moreover, even if a conflict had in fact arisen in counsel's joint representation of all four siblings who held opposing views, any error in failing to relieve counsel was harmless. In *In re Celine R.*, the court applied the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 to such error. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 60.) In that case, the court held that any error in not relieving counsel from representing all three siblings was harmless because it was not reasonably probable the result would have been different if the juvenile court had done so. (*Id.* at pp. 60-61.)

Here, likewise, it is not reasonably probable a different outcome would have resulted if the juvenile court had relieved counsel from representing all four siblings. As discussed above, the juvenile court based its finding of detriment primarily on its assessment of Mother's credibility. The court found that her continuing denial of past abuse, despite the mass of evidence indicating abuse had in fact occurred, did not bode well for K.4's safety if returned to her care. Minors' counsel did inform the court of K.4's wishes in the matter, and K.4 addressed the court at two separate hearings. Moreover, Mother was represented by counsel, who advocated for her position that K.4 should be returned to her. She has not suggested that separate counsel for K.4 could have presented other, stronger arguments to support that position. Thus, we conclude that any error in failing to relieve counsel was harmless.

17

## IV.  DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST

Acting P. J.

We concur:

RICHLI

J.

MILLER

J.

18